1. When the plaintiff in the court below amended her petition to meet the ruling on demurrers, she is estopped to question their correctness, and the cross-bill of exceptions undertaking to do so must be dismissed.
2. Under the present state of the record the only question for consideration is whether the petition as it stood at the time of the overruling of the general demurrers set forth a cause of action.
3. The petition at that time did not set forth a cause of action.
 DECIDED FEBRUARY 22, 1944.
Miss Madge Moore sued C. E. Gregory, W. D. Cocking, and the Atlanta Journal Company for damages for alleged libel. The petition is as follows: "3. Petitioner shows that on the 21st day of November, 1941, and for some time prior thereto, all of said defendants conspired together for the purpose of publishing certain defamatory articles as to the plaintiff, and these defamatory articles were published in the Atlanta Journal on that date and subsequent thereto, it being the joint purpose of said defendants by said defamatory articles to cause the public to believe that she had falsely and maliciously stated and published certain excerpts of a meeting held on the campus of the University of Georgia, in Peabody Hall, by the said W. D. Cocking with certain negroes on May 18-19, 1938, which meeting was officially reported in shorthand by your petitioner at the request of the said W. D. Cocking, said excerpts so published being in the words and figures shown in the Exhibit A attached hereto and made a part of this petition, to which reference is now prayed. 4. Petitioner shows that on November 21, 1941, the said C. E. Gregory, as a reporter for the said defendant, the Atlanta Journal, wrote and had published in the newspaper published by the said defendant, the Atlanta Journal Company, on the first page of its issues on November 21, 1941, an article bearing the headlines: `Charges in Talmadge's Ad Utterly False, Cocking Says. Truthful Minutes of Meeting in Records of Regents by C. E. Gregory, Journal Staff Writer:' thereby meaning to imply and to state specifically that the report of said meeting made in shorthand was utterly false, and leading the public to believe that your petitioner in her capacity as a reporter of the said meeting held by Cocking with the negroes on the campus of the University of Georgia was untrue. Whereas, as a matter of fact, the said excerpts and said report were true. That the articles written by the said Gregory and so published and circulated by the said Atlanta Journal Company did not bear out the said headlines, as more particularly shown by said headlines, and the article was then and there published and shown in Exhibit B, hereto attached, to which reference is duly prayed. 5. That in said article written by the said C. E. Gregory, defendant, and published and circulated by the Atlanta Journal Company, also contained an additional false, scandalous, malicious and defamatory libel against your petitioner, in that the said C. E. Gregory so wrote, and the Atlanta Journal Company so *Page 673 
published and circulated `That he (referring to W. D. Cocking) said he didn't know anything about the report that the stenographer (your petitioner) is now working with a kinsman of Governor Talmadge. That said article was written, published and circulated by the said defendants for the purpose of then and there implying for and causing the public to believe that your petitioner was then and there working for a kinsman of Governor Talmadge, in order to lead the public to believe and so cause the public to believe that by reason of the false and malicious statement that the report of said meeting with the negroes on the campus of the University of Georgia was incorrect by reason of the fact that she was employed by interested persons, the said mentioned Governor Talmadge, at the time being Governor of the State of Georgia, and the said C. E. Gregory and the Atlanta Journal Company were actively and energetically opposing the said Governor of the State of Georgia, in all of his official acts as Governor of said State. Whereas, as a matter of fact, it was well known to the said defendants your petitioner was never employed by a kinsman of said Governor Talmadge, and no such report existed in the State of Georgia that she was so employed, and said statement was made by the defendants falsely and maliciously for the purpose of injuring and damaging your petitioner, and destroying her standing in the State of Georgia and elsewhere. 6. Petitioner shows that the said headlines and the above-quoted excerpts therefrom, and the charge and imputation thereof were libelous per se, and import damage to petitioner, in that by profession your petitioner is a court reporter and public stenographer practicing her profession as such in the City of Athens, Clarke County, Georgia, and other places. 7. Petitioner shows that the Atlanta Journal, the newspaper published by the Atlanta Journal Company, to wit, of date of November 21st, 1941, aforesaid, was a daily newspaper, having a very large circulation, to wit, an estimated circulation of over 50,000 copies in the State of Georgia, and in other states of the United States, and elsewhere, and that said false, malicious, and defamatory libel was scattered broadcast by the defendants, the Atlanta Journal Company, throughout the State of Georgia and the United States, and a copy thereof mailed, or otherwise delivered to all of the subscribers of said defendant company, and many copies of it were put on public sale and sold to the citizens of Atlanta, Decatur, Athens, Georgia, *Page 674 
and elsewhere in this State, and in other states of the United States. 8. Petitioner shows that by means of the publication of the false and malicious libel aforesaid the plaintiff has been greatly injured in her good name, reputation, fame, and character, and exposed to public hatred, contempt, and ridicule with and amongst all her neighbors, the business people of Athens, Clarke County, Georgia, and other good and worthy citizens of said State and county, and elsewhere, insomuch that divers of her neighbors and citizens of the business and professional men and women to whom the honesty and integrity of the plaintiff in the premises are unknown on account of committing of the said grievances from thence, hitherto, suspect and believe, and still do suspect and believe the said plaintiff to have been guilty of falsely reporting the said meeting held by the said W. D. Cocking and certain negroes on the campus of the University of Georgia in Peabody Hall, on May 18th and 19th, 1938, and so falsely and maliciously charged upon and imputed to her by the said defendants aforesaid, and have by reason of the publication of said libel by the said defendants, from thence, hitherto, wholly refused, and still do refuse to have any transaction, acquaintance, or discourse with said plaintiff as they were before used and accustomed to have, and otherwise would have had. 9. Petitioner shows that on October 29, 1942, she gave notice to the defendants herein, as is provided by the acts of 1939, of the General Assembly of the State of Georgia, page 343, of her intention to file suit unless said libelous matter had been retracted by the defendants, and said defendants have refused to make such retraction, and the said written notice is now in the possession of the defendants, the Atlanta Journal Company and C. E. Gregory, and petitioner desires the copies of said notice so served on them be produced by the said defendants at any hearing upon this petition."
Exhibit A, attached to the petition, is as follows: "Excerpts from original shorthand notes of report of `Conference for Higher Education for Negroes,' held at Athens, Ga., in Peabody Hall, May 18th and 19th, 1938. By Dean Cocking. Reported and sworn to by Madge Moore, Athens, Ga.:
"Cocking: I hope, however, higher education for negroes in Georgia be integrated and co-ordinated. I do not think this function will take so long. I am going to make a proposal now, and I say this without any criticism of anybody, that since the Board *Page 675 
of Regents have taken over the University System that there has not been any set-up of any facilities to do much about integration of anybody's program. The whole set-up in the Regents' office at the present time is the chancellor, a secretary and bookkeeper, together with a few clerks who help them at these jobs. Now that we are really serious about an integrated program for negroes, I am daring to propose to you that there ought to be one or more persons in the Regents' office to give their whole time and attention to make possible the things you have been talking about, that is, integrating this whole program for higher education for negroes. Personally, if I had my way, I would like to see in the office almost immediately two negroes who would not have any administrative function whatever, but who would give their whole time and attention in working with the presidents and faculties in this program in an effort of integration. Some might say that cannot be done. I will not agree to that. There should be some simple, but notwithstanding machinery which would bring about integration that everybody is talking about. It is going to be done. The facts are the Chancellor is so busy he has had no time to think about the program. It is also a fact that the presidents of institutions are so busy that they have not got time. Anyhow, they would feel a little backward in saying to others, `Now, come on, boys, and let's do something about it; I think you ought to do so and so.' But I would like to propose for your consideration the possibility of setting up in the Regents' office some very simple program.
"Hubert: Not necessarily being in the office, but the work could be co-ordinated.
"Cocking: I think this integration has two functions. I think there is the job of working with the Chancellor and Board of Regents.
"Clements: As to how this man, this co-ordinator, is going to get anything done. He doesn't have any administrative authority — he is going to have conferences — the question is if he finds things that ought to be changed, how is he going to get them changed?
"Cocking: If he is the right person — by getting the proper people interested and getting the thing brought to the attention. I have a belief that will turn the trick, but if he were given administrative authority, it would ruin it.
"Hornsby: Do I understand these two representatives will be with the Board of Regents? *Page 676 
"Cocking: No. They will have headquarters in the office in Atlanta. They will work in the State all the time.
"Hornsby: Tell us why you suggest two?
"Cocking: I said no more than two. We will probably start off with one. My idea is that it seems advisable that one cannot do it. I have been in State-school systems. My job was to improve the curriculum of 150 schools in the City of St. Louis. In the State Department of Education for teachers, that is exactly how I worked for four years — have them each work with people and present united views, as I expect to present your views.
"Edwards: To whom could this person present this material to?
"Cocking: To the Chancellor and Board of Regents.
"Hornsby: The Board of Regents would be the authority. Now you would have a man upon whom they would largely rely upon recommendations. This man should be highly trained in such work. The school at Fort Valley and the other two schools might have certain things — there would be discrimination. Now the Board of Regents would be very apt to go ahead and take recommendations of the co-ordinator. Would it not be more advisable to have an advisory board of negroes?
"Cocking: I will have both. I think you will have to have a co-ordinator that will be the mouthpiece of those entire institutions. I think for some time you will need the advisory counsel of negroes and probably white persons. I think we might have a negro member of the Board of Regents, and if you do have such a thing, I should think you ought to have an advisory board of negroes for negro higher education. I am for both boards.
"Hunt: We know the Capitol and we know the politics. If some man came in for our governor who didn't think fit of the issues we raised, it would not work at all. I am talking now. We have to think about it. When you come to a board, how would you select a board of negroes?
"Hornsby: It seems to me that is a mighty big point. How would they rank with principals of colleges so far as finance is concerned? His salary would be about equal to principals or superintendents?
"Cocking: He should be equal to the president of an institution. I would get the Board of Regents to appoint an advisory counsel.
"Harris: Would the co-ordinator be able to appear before the Board of Regents? *Page 677 
"Cocking: Yes.
"Hornsby: I am in favor of it unanimously.
"Clay: I am able to speak for 40,000 negroes of Tennessee — there is no racial prejudice there.
"Cocking: I have had some real problems. I expect I have had an experience that few of you have had. Tennessee was one of those States in which legal cases were brought by negroes the last two or three years, asking equality for opportunity for training in certain fields, and the case was brought in Tennessee in regard to a young man who was purported to want to enter the school of pharmacy in connection with the University, and was denied admittance under the State law and constitution. And, of course, Mr. Houston was the leading counsel for defendant. I had to be a witness for the State, and was on the witness stand for about two hours, and one and a half hours was cross-examined by Houston, who tested me to the very limit. He knows how to do the searching for a thing. That whole issue I think is up to this question, and what I am trying to do, and what I know you will do, approach it in a way that will seek the best solution, as far as Georgia is concerned.
"Hunt: What became of the Tennessee case?
"Cocking: We lost. It was appealed to the U.S. Court. The State was upheld.
"Hunt: Wasn't it the Missouri Supreme Court handed down a similar decision?
"Cocking: I do not care much what the courts held. I think the major thing is how to work this thing out. I do not look upon it as a racial issue. I look upon it that the State University should provide where the need is very limited. There are seven states that provide scholarships for negroes. Most of them are too small yet, but, of course, in Georgia we have not even approached that problem seriously.
"Hubert: I think the Board of Regents have discussed it, but I know they have done nothing about it.
"Cocking: That would probably have to be a special legislation for that purpose — have to go through the Legislature. I think it could be done. I rather think the time is fast approaching when whites will be asking admittance after a time in certain of our better negro institutions, such as Hampton and Meharry, certain *Page 678 
phases of work. How many of you favor setting up objectives that we try to give a college education to every negro in the State?
"Harris: Are you bearing in mind the private colleges or denominational schools?
"Cocking: I am talking about the State — that is the only thing I can control, but maybe I cannot control that.
"Hornsby: With reference to pay for teaching in our local schools, do you know how that runs, that is, how the amount paid teachers compares as to white teachers?
"Cocking: Theoretically it should be the same — up to now it is not. I have invited three people out of the State. Bob Clay has been my right-hand man in the State Department of Education in Tennessee. I rely a great deal on his judgment. There may be people who know more about higher mathematics, but when it comes to knowing people and promoting an inter-racial program I do not know anybody who can do better. Dr. Horace Bond, who is now working on a most interesting thing — he is working under a special grant of the Rosenwald Fund this year, along with Prof. Brewton, whom some of you have met. These two boys are going about the entire South this year, attempting to check what makes a good school and what makes a bad school."
Exhibit B attached to the petition is as follows: "Charges in Talmadge's Ad Utterly False, Cocking Says. `Truthful Minutes of Meeting in Records of Regents. By C. E. Gregory. Journal Staff Writer. Athens, Ga., Nov. 21, — Dr. Walter D. Cocking, ousted dean of the school of education of the University of Georgia, lashed out vigorously here Friday at charges made against him in recent advertisements of Governor Talmadge. The charges were that Dr. Cocking advocated co-education of the white and negro races in Georgia, negro employees in the office of the Board of Regents, and a negro member of the board. `Most definitely these suggestions and proposals were not my opinions or suggestions,' Dr. Cocking said in a letter to President Harmon Caldwell, of the University. Views on record. Any person interested in his views can find them fully set out in a report to the Board of Regents on file in the Board's office in Atlanta, Dr. Cocking added. `Any suggestions as to what I believe regarding this matter, other than those in the reports to the Regents, are unequivocally false and without foundation in fact,' he concluded his letter to Dr. Caldwell. Dr. *Page 679 
Cocking charged that the transcript of the minutes of an educational conference at Athens, May, 1938, as published by the Governor, varied in some particulars from the transcript furnished him at the time of the meeting by the same stenographer, and said that additions or omissions created wrong impressions. `For one thing,' Dr. Cocking said, `the Governor's transcript made it appear that I was defending a negro who sought to force his way into the school of pharmacy of the University of Tennessee, when in fact I was a witness for the State, and the negro was barred largely on my testimony.' Not impugning Miss Moore. Dr. Cocking pointed out that he did not seek to impugn any improper motives to the stenographer, Miss Madge Moore, of Athens, who made the transcripts, and added that there might naturally be some variance between a transcript made immediately after taking the notes and one made three and a half years later. He said he didn't know anything about a report that the stenographer is now working with a kinsman of Governor Talmadge. To make his position absolutely clear Dr. Cocking gave out the text of his letter to President Caldwell on the subject: `Dear President Caldwell: I have your recent letter regarding an advertisement in the Atlanta papers, which contained among other things what purported to be a copy of some statements made by me at a meeting held some three and a half years ago. May I state the circumstances which led up to the meeting referred to in the advertisement? The Board of Regents authorized that a survey to be made of higher education for negroes in Georgia, and I was requested to make the study. I assumed then, and I assume now, that I was asked to conduct such a study because it was believed that I was the best qualified man available. As you know, the Chancellor requested the heads of the various units of the University System to make certain of their personnel available to assist with the study, and a number did aid materially. During the conduct of the survey, many suggestions were made by both whites and negroes regarding what they believed should be done to improve negro education. It was felt that one good way to examine these suggestions was to have a meeting of representative people and get their reaction to the suggestions which had been made. Accordingly, a meeting of representative white people was held in Atlanta, and one for negroes in Athens. Chancellor Sanford attended both of these meetings. The same suggestions and *Page 680 
questions were presented to both groups. Among the suggestions which had been made to us, and which we presented at the meetings of representatives of both of the white and negro groups, were the following: (a) Scholarships for negroes to institutions which permitted negro attendance. (b) Possibility of membership on the Board of Regents of a representative of the minority group. (c) One or more negro educators on the staff of the chancellor's office to co-ordinate the activities and programs of the three State negro colleges; to promote efficiency, and secure the maximum benefits from the use of the taxpayers money, etc.' Reactions Sought. `The purpose was to get the thinking and reaction of these groups to the suggestions and proposals were not my opinions or suggestions. I transmitted them to get the reaction of the group. What I believed then, and what I believe now, regarding these matters is set forth in the report I made to the Board of Regents entitled "A Study of Higher Education for Negroes in Georgia." Copies of this report are on file in the office of the Board of Regents in Atlanta. The Board of Regents, after consideration of that report, adopted it in principle unanimously, and appointed a committee to put the recommendations into action. Any person interested in what I believe regarding the organization and administration of higher education of negroes, then and now, can find the answer by examining that report. Any suggestions as to what I believe regarding this matter, other than those in the report to the Regents are unequivocally false, and without foundation in fact. Sincerely yours, Walter D. Cocking.' Campaign Peg. Dr. Cocking does not believe that Governor Talmadge can convince the people of Georgia that he advocated co-education of the races in Georgia because he says the Governor does not believe so himself. He takes the position that the Governor wanted to raise the race question as a re-election out as a peg to hang the campaign issue and picked him on. . ."
Each of the defendants, who were served with the petition and process, C. E. Gregory and the Atlanta Journal Company, filed the following general demurrer to the petition: "1. Said defendant demurs generally to the petition, for the reason that it does not set out a cause of action. 2. Defendant demurs generally to said petition on the ground that it does not set out a cause of action, *Page 681 
because it appears on the face of the petition that the language complained of is not libelous. 3. Defendant demurs generally to said petition on the ground that it does not set out a cause of action, for the reason that it appears on the face of the petition that there is no misstatement or libelous statement made in the article complained of with reference to the plaintiff either in the caption of the article or in the body of the article. 4. Said defendant demurs generally to plaintiff's petition on the ground that it does not set out a cause of action for the reason that the alleged caption of the article, to wit: "Charges in Talmadge's Ad Utterly False, Cocking Says, `Truthful Minutes of Meeting in Records of Regents' by C. E. Gregory, Journal Staff Writer," does not mention the name of the plaintiff, and hence attributes no false or untrue statement to her, and the petition admits that the plaintiff is not charged by the language in the body of the article with any misstatement. It appears therefore that she is not charged, either in the caption or in the body of the article, with writing of the Talmadge ad referred to in the caption of the article. 5. Defendant demurs generally to said petition on the ground that it does not set out a cause of action because the caption and the article complained of, when taken together, do not, either directly or indirectly, or by innuendo or implication, charge the plaintiff with any misconduct, or any conduct which would hold her up to public hatred, contempt, or ridicule, nor does said language in any way reflect unfavorably on the plaintiff or her reputation. 6. Defendant demurs generally to said petition on the ground that it does not set forth a cause of action, because it does not appear that plaintiff has been damaged by the language in the article complained of. 7. Defendant demurs generally to said petition and moves to dismiss it, on the ground that it does not appear that at least five days before instituting this suit plaintiff gave notice to the defendant specifying the article complained of and the statements therein, and stating what she claimed to be false and defamatory, and what she claimed to be the true state of facts. 8. Defendant demurs generally to said petition for the reason that it does not sufficiently set forth any allegations of libel or damages to plaintiff on account of any libel to authorize a recovery of damages." Among other special demurrers, each defendant filed the following: "11. Defendant demurs specially to the language in said paragraph 3, `and these *Page 682 
defamatory articles were published in The Atlanta Journal on that date and subsequently thereto,' for the reason that the suggestion that the articles were defamatory articles is a conclusion of the pleader, without sufficient allegations of fact to support the conclusion, and for the reason that it is not set out on what date or dates the alleged subsequent publications occurred. 15. Defendant demurs specially to the language in paragraph 3, `it being the purpose of said defendants by said defamatory articles to cause the public to believe that she had falsely and maliciously stated and published certain excerpts of a meeting held on the campus of the University of Georgia,' and to the language, `said excerpts so published being in the words and figures shown in exhibit A, attached hereto and made a part of this petition, to which reference is prayed,' for the reason that the published article complained of and attached as exhibit B to the petition is the only article complained of as being published by The Atlanta Journal Company, and said article does not in any way, either directly or indirectly, or by innuendo or otherwise, identify or point to the language contained in plaintiff's exhibit A as being the advertisement referred to in the caption of the article identified elsewhere in the petition as exhibit B, and the language, therefore, that the defendants conspired to make the public believe that she falsely and maliciously published anything is a conclusion of the pleader without any pleaded facts to support it. Defendant further demurs to said language for the reason that not only is that language a conclusion unsupported by pleaded facts, but the article on which the suit is based expressly states that Dr. Cocking was `not impugning Miss Moore.' This directly contradicts the conclusion of the plaintiff that the defendants conspired to make the public believe that she had falsely and maliciously published anything with reference to the meeting. The article does not indicate that she had caused anything to be published either truthfully or falsely. 16. Defendant demurs to the following language in paragraph 3, `said excerpts so published being in the words and figures shown in exhibit A, attached hereto,' for the reason that it is not shown in said exhibit A or anywhere else in plaintiff's petition that the language in exhibit A, was a part of any `Talmadge ad' or all of any advertisement, and for the reason that it is not shown when the language in exhibit A was published, or that it was published in any manner in connection *Page 683 
with the article set out in exhibit B to plaintiff's petition. 38. Defendant demurs specially to the language in paragraph 8, `and have by reason of said publication of said libel by the defendants, from thence, hitherto, wholly refused, and still do refuse to have any transaction, acquaintance, or discourse with said plaintiff as they were before used and accustomed to have, and otherwise would have had,' for the reason that the allegation of libel is a conclusion of the plaintiff without any pleaded facts to support it, and for the further reason that the persons who are alleged to have refused to have any transaction or discourse with the plaintiff are not set out with sufficient particularity, it not being alleged with sufficient particularity who they were, nor what transactions they had before the alleged libel, nor what transactions they had subsequent to the alleged libel, nor how the libel caused her to have fewer transactions with the parties named, nor how the plaintiff was injured or damaged thereby. 39. Defendant demurs specially to paragraph 8 for the reason that the damages alleged in said paragraph are not itemized, and for the further reason that it does not appear with sufficient particularity, either in said paragraph or elsewhere, that any such special or actual damages were suffered by the plaintiff. 40. This defendant demurs specially to the allegations of paragraph 9, for the reason that the allegations contained therein are conclusions of the pleader without sufficient facts pleaded to support the conclusions, a copy of said alleged notice not being attached to the plaintiff's petition, and it not otherwise being alleged with sufficient particularity what the notice contained."
The court overruled all of the general demurrers and all of the special demurrers except those above set forth, and as to them passed the following order: "2. Paragraph 11 of the demurrer is sustained as to dates of alleged subsequent publications, and overruled in other particulars. 3. Paragraph 15 of the demurrer is sustained as to plaintiff's failure to identify exhibit A as the advertisement referred to in the caption of exhibit B, and overruled in other particulars. 4. Paragraphs 16, 38, 39, and 40 of the demurrers are sustained. 5. Plaintiff is allowed 15 days from this date within which to amend the petition so as to meet the grounds of demurrer which have been sustained." (Dated October 25, 1943.) On November 4, 1943, the trial judge signed a bill of exceptions, in which the defendants below excepted to the overruling *Page 684 
of the general and special demurrers. On November 8, 1943, the judge allowed, subject to objection and demurrers, certain amendments filed by the plaintiff "to meet the court's ruling on demurrers which have been sustained," as stated in the amendments. By cross-bill the plaintiff excepts to the sustaining of the special demurrers to meet which rulings the amendments were filed, and the amendments are certified as part of the record.
1. The cross-bill of exceptions must be dismissed, because, when the plaintiff amended to meet the ruling on the special demurrers she acquiesced in the ruling and is estopped to question it. The amendments cannot be considered, because the court overruled the general demurrers unconditionally and without reference to amendment, and because they were allowed subject to objection and demurrer. Assuming that the judge could allow them after signing the bill of exceptions bringing the case to this court, the time for objections and demurrers to the amendments had not expired at the time of the filing of the cross-bill, and the allowance of the amendments does not appear to be final.
2. It is not clear what the court had in mind as to a disposition of the case in the event that the petition was not amended to meet the special demurrers which were sustained. We can only go by the record, and it shows that the general demurrers were overruled unconditionally, which prima facie means that the petition set forth a cause of action irrespective of whether any amendments were filed. We can only consider the record as it was at the time of the overruling of the general demurrers.
3. The petition as it stood at the time of the overruling of the general demurrers did not set forth a cause of action. At that time it did not allege that the proceedings reported by the plaintiff were the advertisement referred to in the article written in the Atlanta Journal, or that they were a part of it,
and if just a part, did not contain or set forth the advertisement as a whole so that the meaning of the article could be interpreted in the light of the advertisement as a whole. It is regrettable that we cannot now pass on all the questions, but we cannot do so without considering records *Page 685 
which are not properly before us, and without passing on questions which the trial judge has not adjudicated. All that we can rule now is that the petition at the time the general demurrers were overruled did not set forth a cause of action for the reasons shown above. All other questions are left open.
The court erred in overruling the defendants' general demurrer to the petition.
Judgment reversed on main bill of exceptions. Cross-billdismissed. Sutton, P. J., and Parker, J., concur.